This is number 24-14122, Ralph Harrison Benning v. Tyrone Oliver, the Commissioner of the Georgia Department of Corruptions. Mr. Thompson, whenever you're ready. Thank you, Your Honor. May it please the Court. Under the relevant Department of Corrections policy, a prisoner may exchange emails with the 12 individuals who have been approved to visit him in person. Inmate Ralph Benning challenged that rule under the First Amendment, and the District Court enjoined it. On appeal, Mr. Benning does not dispute that the State may heavily regulate prisoners' use of and access to email. He merely claims that this restriction is the proverbial straw that breaks the camel's back. Every other Department email restriction remains enforceable, but the Department simply doesn't need this one to ensure prison security or public safety. That theory contradicts the Supreme Court's repeated and emphatic reminders that Federal courts do not sit as supervisory wardens. Instead, Turner requires deferential review, under which it is the prisoner's burden to show that the logical connection between the regulation and the State's asserted goal is so remote as to render the policy arbitrary or irrational. If this deals with outgoing email, why aren't we bound by Benning 1 to apply Martinez? Thank you, Your Honor. So that is Mr. Benning's primary argument on why Martinez applies here, and I disagree with it for the simple reason I think it's inconsistent with the structure and reasoning of the panel's decision in Benning 1. What the court said in Benning 1, and we disagree with this first finding, but we're taking it as it comes to us for purposes of this appeal, is that under Martinez, prisoners have a liberty interest in email communications. Then it turned to the substantive question of the First Amendment, and it did not decide whether Martinez or Turner applies to that question. It explained the party's arguments on both sides, and then it said it didn't need to address that question because under qualified immunity, there was no clearly established law either way, and thus the individual claims against the prison officials could not go ahead. So all of that analysis in the second half of the opinion wouldn't make any sense and wouldn't be necessary if what the court had concluded in the first few pages of Benning 1 was that Martinez was indeed the test that would apply to the substantive First Amendment analysis of this regulation. So I just don't think that argument can be squared with what the court actually said. It would have said there was clearly established law, or it would have simply said that the conduct violated the First Amendment, or at least said we think Martinez applies here. It didn't say any of those things. So I think that question was not decided by the panel in Benning 1. Didn't the panel say that a reasonable jury could find a constitutional violation? So I don't think that has anything to do with the question that the court expressly reserved. But how could the panel say that the jury could have found a constitutional violation without explaining what the constitutional violation was? So if we're talking about the… You're saying it's limited to the due process question? Exactly, Your Honor. That is correct, and that is what the court ultimately ruled in Mr. Benning's favor on in the first appeal. On the substantive question of whether this regulation is consistent with the First Amendment, the court teed up the question, does Martinez or Turner apply? And it said we don't need to answer that question because qualified immunity applies to the damages claims against the individual prison officials, which was what was before the court at the time. I submit that the answer to whether Martinez or Turner applies is very straightforward. Even if we kind of assume that Martinez has this ongoing vitality with respect to outgoing correspondence, in Perry this court said that Turner rather than Martinez applies if the outgoing correspondence in question is distinguishable from that of Martinez on the axis of does it impose an inherent security risk. And Mr. Benning does not dispute that outgoing email communication from inmates to those outside the prison wall poses a legitimate security risk. If we were to accept that reading of Martinez that applies to only some outgoing correspondence that doesn't pose a security risk, in what kind of situations would we still apply the Martinez standard? Because it seems to me that outgoing communications that don't pose a security risk would fail under the Turner test as well. Yes, Your Honor. I think this is kind of an artifact of Martinez essentially being— I'm sorry, they would be upheld under the Turner standard. Yes, I understand, Your Honor. So I think this is kind of a difficult question to answer because Martinez has been so infrequently applied. The Supreme Court applied it only once in the decision itself. And so to understand the category of cases that Martinez applied to, I think you have to take a close reading of Martinez and Turner and the other cases in this line. And the way I see it, Martinez applies where there is really not a balancing act to perform because the state isn't saying here is legitimate penological interest and the prisoner is saying here is the infringement on my rights and the prison has struck a balance. We're trying to assess whether that balance is consistent with the Constitution. Martinez is a case where the prison said we don't want the outside world knowing about what's happening in this prison, so we are going to censor these outgoing communications. And as the court put it in Martinez, the heart of the state's argument was that it didn't need to advance a legitimate penological interest. So Martinez wasn't articulating, as the court said in Turner, this kind of perspective standard for prisoners' rights cases because it didn't need to. Because the state essentially, the prison essentially came in and said we can do whatever we want. We don't need to advance legitimate penological interest. We haven't engaged in balancing. What Turner says and all the cases that come after Martinez say is that when we actually are in that posture where the state is saying we have imposed this regulation, we've done it because we are trying to balance the prisoners' rights with our legitimate penological interests, it would make no sense to say that simply because the policy is about outgoing correspondence and all those kind of underlying substantive factors are the same, that we're going to suddenly switch back into Martinez instead of Turner. And I don't think any decision from this court supports that approach. And again, Perry was very clear on this. And I don't think this court has to decide what it kind of really takes to move from Martinez to Turner in terms of security risks because, again, Mr. Benning has never disputed that there are inherent security risks. He simply doesn't like the mix of policies that the prison has chosen to advance that goal. He says that this one doesn't have any marginal benefit over the other ones. The district court concluded alternatively that if Turner applied, the policy still failed. Could you address the district court's decision on that score? Certainly, Your Honor. So obviously we disagree with that conclusion. The district court, pivotal to its analysis was its observation that the software used to screen emails, quote, should be enough to alleviate the security concerns. That kind of speculative second guessing has no place under Turner or Martinez. Why is it speculative second guessing? You have the software. First of all, you need the people who an inmate can correspond through email with have to submit their names, email addresses, and other information to the prison. All of the emails can only go to one person. They are screened automatically by software. If any suspicious words, themes, topics are flagged, it goes to an individual prison official who then conducts individual screening. So tell me what the concern is. Yes, Your Honor. So you're absolutely correct. We agree that each of those policies is advancing prison security, but they're each attacking the problem from a different angle. So I guess I have a point about the way this works and a doctrinal point. Let me ask you, think about this hypothetical. Same policy concerns and justifications on the prison side, okay? And you say you can only correspond with one family member. Constitutional under Turner? I believe so, Your Honor. Our position throughout this litigation has been that prisoners don't have a First Amendment right to engage in email communications at all. So obviously that greater position subsumes the lesser position. Do they have a First Amendment right to correspond by regular hard copy mail? We haven't disputed that there is a constitutional right for inmates to communicate with those outside the prison wall. We haven't argued that. We have argued that there is not a right to a specific form or medium of that expression. And Mr. Benning, I think, conceded that. Tell me why the First Amendment doesn't apply to modes of communication developed in the 20th century in the same way that the Fourth Amendment applies to technologies that are first developed in the 20th century. Your Honor, our argument is not that the First Amendment does not apply to some mediums and applies to others. Our point is that in the prison context, the right must be defined at a high enough level of generality to allow prison officials to adapt to security conditions. And therefore, the right, as we see it, is communication with those outside the prison wall. And as long as there are avenues available to do that, which, again, no one disputes that those avenues are available here. And if I could get back to the question of kind of what is the marginal value, none of the other policies Your Honor identified gets at the following issue, which is the substantive identities and backgrounds and screening that go into the people he's communicating with. None of the other policies get at that problem. So what that does is it reduces the kind of downside risks associated with any evasion of the other rules. For instance, if a prisoner gets something through screening by using code words, which we know from Mr. Benning's own evidence happens in the prison, the downside risk of that scenario is less when the universe of people that he's able to communicate with this medium are those who the prison has already decided, has already evaluated. But that evaluation doesn't get eliminated if SOP 204.10 goes by the wayside. You would still require that every person that he wants to correspond with has to submit his or her name to the prison, has to undergo the checks, has to provide his email or her email address, et cetera. You don't lose connection with those people. He's not challenging your requirement that every email correspondee register with you so that you know identity, email, et cetera. He's challenging the number of people that he can correspond with. I don't believe – that is not my understanding of his claim, Your Honor. My understanding of his claim is that he wants to enjoin this provision so that he can communicate with anyone who has essentially mutually agreed to communicate with him by setting up the JPAY account. Well, what does 204.10 say? What does the policy say? Does the policy deal with – 204.10, does it say anything about the registration of correspondees or it's just that you only have 12 people and it's your 12 on your prison visit list and only two can be non-family members? I thought that was the sum and substance of 204.10. So the email contact restriction says that the inmates can only email up to 12 people who have been approved by the prison warden to visit them in prison and then incorporates the definition of who those people are. He wants to get rid of that limitation on the email. The district court explained in its order that he's not challenging any of the other restrictions like pre-registration with the prison authorities or anything like that. He just doesn't want to be limited to the number of people. Your Honor, if his quarrel is with the number 12 and wants it to be a bigger number, I don't think that helps his case because that is just yet more line drawing and second guessing what the appropriate number is. That's also – that's not what I have taken from his appellate brief here, but if that is his claim – All the district court – I don't want to minimize what the district court did. What the district court did was issue a permanent injunction against the enforcement of 204.10, right? And only 204.10, right? Unless I missed something. No, I believe that's correct, Your Honor, but I think what we have understood and the effect of that on the prison is that the prisoners are able to communicate with those who are not on their contact list. Sure, but that doesn't mean you can't force the prisoner, the inmate, to tell you who the other people are so that you can make them register and you have a record of them, know who they are, et cetera, et cetera. So, again, I don't – They have to provide their consent to receive the emails. They have to provide you a credit card to pay for some of the emails. There's no challenge to that aspect of the prison policy. The district court didn't enjoin that. So my understanding is that what Mr. Benning is hoping to achieve in this litigation is the ability to correspond with individuals who have not gone through the approval process that applies to people who have been allowed to visit him in prison and instead, accepting all the other restrictions, he wants to be able to communicate with those who have set up the J-PAY and have that connection. So they are known to the prison in some respect. But either way, Your Honor, I still think what we're doing is we're second-guessing the anticipatory judgments about security that prison officials are making in these complex situations, and I don't think that has any role under Turner R. Martinez. All right. Thank you very much. Mr. Gonzalez. Good morning, Your Honors, and may it please the Court. Nicholas Gonzalez from ORIC. I am pro bono appellate counsel for Mr. Benning. So I'd like to start with what we are challenging. We are challenging the restriction on the 12-person maximum that Mr. Benning can send emails to. That means that he can only email up to two people who are not family members and no more than that. And he can seek changes to that number of people only about twice a year. I'd like to start with Martinez and then address Turner. Well, let's talk about the issue that I was discussing with Mr. Thompson. You did, as I understood the district court's order, you did not challenge the requirement through a different policy provision that every person that an inmate corresponds with by email be registered, provide consent, et cetera, et cetera, or did you? No, and J-PAY, the email system itself, requires that. Someone has to affirmatively sign up for J-PAY, give their name, give their credit card information. Then they have to elect to email the prisoner that they want to email. And then once they do that, then the prisoner can respond to those emails. Those other features are inherent to the J-PAY system, and we are not challenging those features which apply just by default under the J-PAY system. Turning first to Martinez, the commissioner says that Martinez essentially only applies in a very limited set of cases in which the department has offered no explanation for a restriction. But we know that's not the case because in Thornburgh, the Supreme Court was clear that it was expressly preserving Martinez for outgoing correspondence. It said that the reason why outgoing correspondence requires a closer fit is because it does not have the same dangers as incoming correspondence. And it wasn't that the correspondence there was innocuous. In fact, the prison wanted to restrict inflammatory racial and political correspondence and said that that could create problems within the prison. The problem in Martinez was that there was no credible connection between the asserted security justification and the restriction that the prison was defending, which is the exact same problem that we have here. The prison has offered nothing but a conclusory assertion that the email contact restriction advances security. That is nothing more than what the Supreme Court has said is insufficient, even under Turner. In Beard, the Supreme Court said you cannot just have a formalistic, logical connection between the restriction and the security justification. If you could, then every case would simply end when the prison says, we need this for security, case closed. And we know that's not the case. In every single case that the parties cite in which Turner was addressed, there was more evidence than there is here. And here I'm talking about Davila, I'm talking about Perry, I'm talking about Pesci, Pope, prison legal news, Rodriguez. There was some evidence in those cases that exceeds the evidence that the prison here has proffered. And I'd like to remind the Court that this litigation has been going on for eight years. This is not the first appeal. This is the second appeal. There was not one round of summary judgment. There were two rounds of summary judgment. The prison has had every opportunity to proffer a credible connection between the restriction and the asserted security justifications. It has not done so. So much so that on appeal, the prison raised brand new arguments, never raised before in the district court, and tried to shore up the deficient evidentiary record by citing law review articles and other cases to suggest that this restriction advances the security interests because in other scenarios, other restrictions might advance the security interests. And in those other scenarios, there's evidence connecting the restrictions to security interests. That is not how summary judgment works. That is not how litigation works. Here there was either an affidavit or a declaration by a GDC criminal investigation analyst, right? Mr. Wallace? That's correct. Which the district court discussed in its order. Why do you think that affidavit or declaration is insufficient under either or both Martinez and Turner? Sure. So the evidence that Ron is referring to is at DOC 64-4, paragraphs 28 through 30. And that declaration says that the rule exists due to, quote, security concerns, end quote, and to protect against, quote, possible threats to citizens and prison personnel and other inmates. That's nothing more than saying this restriction is necessary for security, which we know is not sufficient under Beard, as well as this court's unpublished decision in Dacre, where more than this one sentence conclusory assertion justifying the restriction, there were two sentences justifying the restriction that actually explained how it is the restriction advanced security. If that was insufficient in Dacre, then by necessity it's insufficient here. And even in Davila, the case that the commissioner likes the most for the notion that you don't need much evidence, the commissioner says, quoting a part of Davila that says that despite the lack of evidence, the commissioner, the department there still had satisfied Turner Factor 1. That is what that opinion says, but if you look at the opinion as a whole and you read it from the beginning to the end, you'll note that there was actually evidence there. So that quote was not saying that no evidence suffices. It was saying that it was commenting on the relative weakness of the evidence. And there was a prison warden's affidavit that explained how it is that the restriction was necessary because of the dangers to the prison based on contraband, weapons risks, and resources. We don't have anything like that here. So the restriction fails for the simple reason that the department has not proffered a credible connection between the restriction and the justification. Has had many years to proffer evidence, has failed to do that, and then on appeal, had to manufacture post hoc justifications defending the restriction based on an email system that simply does not exist. As we explained in our response brief when we went through every single one of the manufactured for appeal security risks, that they were all premised on a system that does not exist. I have used this system. It is not Gmail. It is not Outlook. It is a very restricted, closed system where the person must affirmatively opt in, must then sign up with a credit card, then must pay for a stamp, and then send emails, and then receive emails, all of which are thoroughly screened. And if your honors have not used this system, I would encourage your honors to look at DOC 7033, where there are pictures of how the system looks. And you'll note that it's not like Gmail. It's not like Outlook. I'd like to also address… Does the record indicate, given the prison's screening process, how long it takes for an outgoing email to reach its intended recipient on average or generally? So it depends. It could be within minutes, but normally, as I understand it, it's two hours. That is from conversations I've had with Mr. Benning himself. And I understand that when there are flagged words, then the delay is even greater because then a human must review the emails and determine whether the flagged term is being used in an innocuous context or whether it, in fact, poses a security risk. And on the screening issue, I'd like to point out that in the commissioner's reply at page 23, the commissioner asserted that every handwritten letter gets screened, and that's one of the reasons why that justifies treating emails differently. But that's not correct. If you please, if you could look at DOC 156-9. This is at Volume 3 in the appendix that we submitted at page 120. It says that… What's the citation again? DOC 156-9. And it's actually pages 117 to 120. There it's clear that handwritten letters actually have less rigorous screening than emails. The handwritten letter policy says, and I quote, outgoing personal mail shall be mailed, sealed, but may be opened for inspection, may be opened for inspection. And then it contemplates that all unread personal letters will have a stamp that tells the recipient that the letter has neither been opened nor inspected. So whereas every single email gets screened by the screening system and then flagged by a human reviewer, that is not the case for handwritten letters. For incoming letters, actually, at page 120 of the document I just cited, it says that only a portion of those are randomly selected and read. Okay. So that further undermines the notion that emails are more dangerous than handwritten letters. If that were the case, one would expect that the handwritten letters would be screened more effectively if, in fact, it was this content that's outgoing that poses security risks that the prison wants to guard against. I'd also like to discuss the Commissioner's long con fraud theory. So that is their theory that the system requires email contact restriction because otherwise a prisoner would engage in a long con. I think the idea is that there's this hypothetical chain of events in which Mr. Benning sends out a letter then a potential victim decides to sign it for J-PAY, then enter their credit confirmation, then affirmatively select Mr. Benning to email with him, pay for stamps, send him an email, then Mr. Benning responds, and then over some unspecified time there's enough emails that evade the screening system that then somehow convince this person to engage in a fraudulent scheme with Mr. Benning. That series of hypothetical events is not supported by the record, and it is also at odds with the requirement that there be an actual connection between the risk and the security restriction, which there isn't here. Who on the Commissioner's side at summary judgment provided evidence of one kind or another with regards to the dangers posed by eliminating the inmate contact number restriction? Was it just Mr. Walsh? Just the declaration, yes, just the declaration that Your Honor referenced earlier, and he is someone that has experience reviewing emails for security risks. So the Commissioner did not provide a declaration or affidavit? That was a declaration, and it's just the one sentence justification that I read. No, but Mr. Wallace is not the Commissioner. Correct. Mr. Wallace was an analyst, right? Correct. My question was, the Commissioner did not provide an affidavit or declaration? The Commissioner did not provide an affidavit or declaration. Did any prison wardens provide an affidavit or declaration?  The only affidavit that justifies the restriction is the one that we've been discussing where the analyst explains the security justification. And that goes back to the burden. Under even Turner, it is the prison that bears the burden of establishing more than a formalistic logical connection between the restriction and the security justification. We know that from prison legal news where this court held that, and I'm quoting now, the first Turner factor requires the department to show that there is a rational connection between the restriction and its interest in prison security and public safety. The reason that that rule exists is for a very reasonable and expected practical purpose. Unless the prison presents a credible connection between the restriction and the security justification and explains why it is that the restriction advances security, Mr. Brennan could not then come forward and say, no, your justification is arbitrary and it's therefore unconstitutional. Only once the prison provides that explanation can a prisoner then carry the ultimate burden of proving unconstitutionality. And here, as we've been discussing, the prison has offered nothing more than a conclusory assertion that is insufficient under certainly Martinez and also under Turner. The district court got this case right. It enjoined a restriction that the prison has not justified with anything more than a conclusory assertion and that the record shows is arbitrary and that the commissioner had to defend on appeal by inventing post hoc justifications premised on an email system that does not exist in this case. We would ask that this court affirm the district court's judgment. Thank you very much. Thank you, Your Honor. If I may, I'd like to turn to the question that you started out with with my friend and finished up in my argument about the injunction and what's happening. So what the court – I'm reading from the court's order. It says enjoined from enforcing SOP 20410's email contact restriction, i.e., limiting an offender's email contacts to those 12 persons who have been cleared to be on that offender's in-person visitation list. When you asked my friend about that, he pointed to the features of the J-PAY system. Those are not the same as the screening functions that the prison applies to the 12 individuals who are on the contact list. Therefore, the only logical – But nothing stops the prison from subjecting everybody who he's going to email with the same scrutiny. You just can't limit it to those 12 people. There's nothing to stop the prison from saying everyone that he wants to correspond with has to be on a list and we subject them to the same scrutiny as visitors. You just can't limit the number. That – I don't think my friend – that's how my friend described his claim. I think his claim was that the only restrictions that are going to be left after this injunction are the restrictions that are inherent in the J-PAY system. This was not an affirmative injunction for us to go out and add people to the list. It was a negative injunction against this requirement that he's challenged. The result of it is that a prisoner like Mr. Benning can communicate with individuals who are not on his list and whose only screening is simply that they have the J-PAY account. On the merits, my friend talked a lot about the burden. There is no evidentiary burden on the prison to come forward with a justification for the rationality of its policy. Sure there is. You have to come up with something. You just can't make a – well, you can't make – the prison can't make a blanket statement that something is required by security concerns. You can't make that blanket statement. You can't – the prison official can't, with a crazy hypothetical, can't say we need black walls, walls painted in black for security reasons, period, end of story. That's not enough, right? So you have to explain a little bit about why you need black as opposed to some other color. You need something coming forward, right? Isn't that the first-turner factor? I think what the first-turner factor is asking is if there's a logical connection. What the prison does is it identifies the legitimate penological interest that it asserts has the connection to that regulation, and then it is the prisoner's burden to show that it is irrational. Now, in a case like that, I think it would be very easy to show. Mr. Benning has never disputed that limiting the individuals who a prisoner can communicate with by email outside the prison has a connection to a legitimate penological interest. He's simply saying it's not – What is that penological interest? Security and public safety are the ones we primarily rely on. That tells me nothing. What is the security interest? Because you allow him to send an unlimited number of letters, and people can copy those letters and distribute them to as many people as they want. Those letters are not all screened and censored. So what is the specific danger stemming from email that doesn't exist with letters? It's because electronic mail exacerbates the risk inherent in outgoing communication by increasing volume, reach, speed, efficacy, all the technological ways in which email is different from letters. Why is that a security concern? Because it heightens the downside risk associated with communications that evade other restrictions such as screening and that are communicating – But you're screening the emails. That only works if they're caught. And we know from the evidence in the record that they're not always caught. And so it makes total sense for on the back end to have a last line of defense. That is, if you are able to communicate – Is this the justification that you're providing? Is this the one that was provided in the affidavit? I think it's a – What the affidavit is saying is that there are security risks inherent with email communication outside the prison wall, and that we have this policy in effect to mitigate those risks. I think once we've said that, the burden is on the other side to explain why that's illogical or irrational. You don't have to explain what those risks are? Well, I think we have. I think we've explained them. In an evidentiary way, that declaration by Mr. Wallace didn't have to explain what those risks are? I think that's the upshot of the dozens of cases from the Supreme Court and this court saying that – Yes, your answer is no, that he doesn't have to explain? So if the other side is coming forward, we are going to rebut that. No, no, no, no, no, no. The evidentiary burden is not on us. At the end of the day, I agree with you. But at the beginning, you just can't say that something is required by security concerns without providing some sort of link, right? I think the link is transparently obvious in this case, such that pointing out that we have implemented this policy to deal with security concerns is enough because it's transparently obvious. What if you're just wrong and there's no security concern? Well, that's the kind of thing he would need to come forward with. Where does that get figured out? That gets figured out in litigation when the plaintiff comes forward with evidence indicating that. But the only evidence on your side of the case is Mr. Wallace's affidavit, which is pretty thin. Your Honor. This is a summary judgment. This is not an exchange of ideas by people at a think tank. So what this court said in Rodriguez is that to succeed on the claim, an inmate must show that the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. He hasn't attacked that question from the standpoint of there are no risks. My point is that you may not have shown the logical connection in the first place. Your Honor, the logical connection between security and restricting email to certain recipients is not even disputed. He just says we've already taken care of the problem with a bunch of other policies. That's what makes this case different. He's not saying that we don't have a security interest in limiting the recipients of the emails. He just thinks that there's no marginal value to that regulation in light of the other ones that we've already imposed. That is the least restrictive means analysis. That might have a home in intermediate or strict scrutiny. His argument about why don't you apply this to letters is an under-inclusiveness argument. The Supreme Court just reminded us in Paxton that doesn't even apply to intermediate scrutiny. It surely has no purchase in the context of Turner or Martinez, where the whole point is that we're not going to second-guess the anticipatory security judgments of prison officials. I'll give you 30 seconds to wrap up. That's all I have, Your Honor, unless you have any other questions. Okay. Thank you both very much. Our next case is number